**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| LEVTEC, LLC, | : | Case No. 3:14-cv-00276 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| MICHELLE BARKAN, BARKAN | : | |
| ADVERTISING, LLC, TURN INC., | : | |
| | : | |
| Defendants. | : | |

_____

**ENTRY AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT
(DOC. 44) FILED BY DEFENDANTS MICHELLE BARKAN AND BARKAN
ADVERTISING, LLC AND DENYING MOTION FOR SUMMARY
JUDGMENT (DOC. 45) FILED BY DEFENDANT TURN, INC.**

_____

This case is before the Court on the Motion for Summary Judgment (Doc. 44) filed by

Defendants Michelle Barkan and Barkan Advertising, LLC (together, the "Barkan Defendants")

and the Motion for Summary Judgment (Doc. 45) filed by Defendant Turn, Inc. ("Turn").   For the

reasons below, the Court **DENIES** the Motions for Summary Judgment in their entirety.

I.      <u>BACKGROUND</u>

    **A.** <u>**Factual Background**</u>

Levtec is an Ohio limited liability company based in Montgomery County, Ohio.   (Doc.

51-1 at ¶ 2.)  Levtec owns the rights to a line of products known as Morph Fire, which are

comprised of kits that convert different brands of paintball guns to 6mm BB guns.   (*Id*. at ¶ 3.)

In early 2013, Levtec decided to develop an online advertising and marketing plan to roll

out the Morph Fire products for sale to the public.   On or about March 8, 2013, Michelle Barkan

made a PowerPoint presentation to Levtec about Barkan Advertising's marketing capabilities.

(Doc. 51-1 (PowerPoint) at PAGEID # 614.) Levtec and Barkan Advertising then allegedly entered into an oral contract by which Barkan Advertising would assist Levtec in developing and executing an online advertising and marketing plan for Morph Fire products. (*Id.* at ¶ 10.) The Barkan Defendants assert both that the parties entered into an oral contract—although they disagree as to its specific terms—and that they failed to enter into any contract because there was never a meeting of the minds as to its essential terms.

Michelle Barkan introduced Levtec to three businesses: Undisclosed Location, Inc. ("UNLO"), Website Pipeline, Inc. and Turn. (*Id.* at ¶ 9-10.) Levtec entered into a contract with UNLO to provide creative artwork and other services in the Morph Fire campaign. (*Id.* at ¶ 9.) Levtec entered into a contract with Website Pipeline to set up a website for the Morph Fire campaign. (*Id.*) Levtec was satisfied with UNLO's and Website Pipeline's services and paid them for their work. (*Id.*) Levtec's relationship with Turn was more complicated.

Turn is a digital marketing company that, among other services, facilitates bidding and ad serving for customers across digital media including websites and social media platforms. (Doc. 45-6 at ¶ 4.) An instance of a displayed ad to a single user is known as an "impression." (*Id.* at ¶ 5.) Turn facilitates the delivery of "impressions" for its advertiser customers. (*Id.* at ¶ 6.)

According to Levtec, Barkan originally proposed a budget of $141,000 for Turn to produce a total of 30 million online advertising "impressions" between September and December 2013. (Doc. 51-1 at ¶ 10.) Levtec asserts that it did not agree to Barkan's proposal, however, and instead agreed to a prepayment format for online advertising impressions. (*Id.*)

Barkan ultimately provided Levtec an "Insertion Order" dated September 25, 2013, which described the services that Turn would perform to produce online advertising

2

impressions. (*Id*.; Doc. 45-7.) In particular, the Insertion Order specified the cost for Turn to provide three ad facilitation services: $45,000 for "Turn Predictive Targeting & Site Retargeting," $15,000 for "FBX Predictive & Site Retargeting," and $30,000 for "Turn Predictive Targeting & Retargeting PreRoll Video." (Doc. 45-7.) Turn was to deliver 15,000,000 impressions, 5,000,000 impressions and 3,333,333 impressions for each category, respectively—a total of 23,333,333 impressions. (*Id*.) Levtec's President signed the Insertion Order and, on September 27, 2013, the Insertion Order was countersigned by Turn's Director of Revenue Operations. (*Id*.)

On November 22, 2013, Levtec signed a written "Agency Authorization" for Barkan to purchase or book advertisements on Levtec's behalf. (Doc. 44-1 at PAGEID # 375; Doc. 45-4 at PAGEID # 488.) Under its terms, Levtec assumed responsibility to pay for "all services ordered by (Barkan) on its behalf, until payment" was delivered to Barkan. (*Id*.) Both Levtec and Barkan assert that the Agency Authorization was intended to permit Barkan only to purchase advertising with Time Warner Cable. (Doc. 51 at 8; Doc. 44-2 at ¶¶ 7-8.) Turn contends, however, that the Agency Authorization generally authorized Barkan to purchase media on Levtec's behalf, including from Turn. (Doc. 45-1 at 4.) At the end of November 2013, Barkan purchased $5,000.00 of media advertisements with Time Warner Cable. (Doc. 45-1 at 54-55.)

On December 20, 2013, Michelle Barkan, purportedly on Levtec's behalf, entered into another Insertion Order with Turn. (Doc. 45-8.) The December 20th Insertion Order provides that Turn is to provide three ad facilitation services for Levtec at the following costs: $10,000 for "Turn Predictive Targeting & Site Retargeting," $5,000 for "Turn Contextual Retargeting," and $5,000 for "Turn Predictive Targeting & Retargeting PreRoll Video." (*Id.*) For each

category, Turn was to deliver 3,333,333 impressions, 1,250,000 impressions and 555,555 impressions, respectively—a total of 5,138,888 impressions. (*Id*.)

Both the September 25th and December 20th Insertion Orders incorporate by reference the "IAB Standard Terms and Conditions for Interactive Advertising for Media Buys of One Year or Less v. 3" (the "IAB Terms"). (Docs. 45-7, 45-8, 45-9.) The first paragraph of the IAB Terms states:

> These Standard Terms and Conditions for Internet Advertising for Media Buys One Year or Less, Version 3.0, are intended to offer media companies and advertising agencies a standard for conducting business in a manner acceptable to both. This document, when incorporated into an insertion order, represents the parties' common understanding for doing business. This document may not fully cover sponsorships and other arrangements involving content association or integration, and/or special production, but may be used as the basis for the media components of such contracts. This document is not meant to cover the relationship between a publisher and a network, or direct advertiser buys with publishers.

(Doc. 45-9 at 1.) The IAB Terms address, among other issues: (a) the specific terms to be included in insertion orders, (b) inventory availability, (c) ad placement and positioning, (d) payment and payment liability, (e) Turn's reporting obligations, (f) cancellation and termination of insertion orders, (g) relationships between Turn, (h) the client and the client's authorized agent, (i) indemnification, and (j) limitation of liability. (*Id*.)

According to Turn's reporting and invoicing system, through October 15, 2013, Turn had delivered a total of 46,642,691 impressions for the Levtec Morph Fire campaign. (Doc. 45-6 at ¶ 20; Doc. 45-10 at 2.) This included totals of 45,273,874 impressions for Turn Predictive Targeting, 105,070 for Turn Retargeting, and 506,488 for Turn Predictive Targeting PreRoll Video. (Doc. 45-10 at 1-2.) Turn issued invoices pursuant to the September 25th and December 20th Insertion Orders to both Levtec and Michelle Barkan, as Levtec's agent. (Doc. 45-6 at ¶¶ 23-28.)

4

In late October or early November of 2013, Levtec issued a payment of $47,000.00 to Barkan.   (Doc. 44-1 at 56, 135-136.)   The payment was to "cover services performed by Barkan and TURN for September and October," including Barkan's 15% fee.   (*Id*. at 136-138; 142-143.)   Of the $47,000, Barkan paid $29,157.16 to Turn, which covered only two of its invoices.   (Doc. 45-6 at ¶¶ 23-24; Doc. 45-11.)   Levtec made no other payments to TURN or Barkan for their services on the advertising campaign.   (Doc. 44-1 at 136-138; 142-143.) Levtec also never paid Barkan for the advertisements that she purchased on Levtec's behalf from Time Warner Cable.   (*Id*. at 55-58.)   And Levtec never directly paid Time Warner Cable's invoice.   (*Id*.)

Turn contends that it is owed $60,842.84 under the September 25th Insertion Order, along with the entire $20,000 balance under the December 20th Insertion Order.   (Doc. 45-1 at 8.)   Turn submitted invoices for the outstanding amounts but never received payment.   (*Id.*) Levtec contends that it is not obligated to pay Turn at all.   (Doc. 25 at ¶ 29.)

## B. Levtec's Second Amended Complaint and Defendants' Counterclaims

In the Second Amended Complaint, Levtec asserts a total of four claims.   The first two claims are for fraud in the inducement and breach of contract against the Barkan Defendants. (Doc. 31 at ¶¶ 20-26.)   Levtec alleges that Barkan made false and misleading representations to Levtec to induce it into entering an oral contract with Barkan Advertising to provide advertising services.   (*Id.* at ¶¶ 21-23.)   Levtec alleges that the Barkan Defendants breached their contract with Levtec by "failing to deliver a successful online customer website interface."   (*Id.* at ¶¶ 25.)

Levtec's other two claims are for declaratory judgment and breach of contract against Turn.   (*Id.* at ¶¶ 27-36.)   Levtec seeks a declaratory judgment Under Ohio Revised Code Chapter 2721 "that Turn was at all times relevant to this Second Amended Complaint in contractual privity

5

with, and was the subcontractor of, Barkan, and as such must look to Barkan for any payment to which Turn is entitled for its services on the project." (*Id.* at ¶ 29.) Additionally, Levtec seeks a declaratory judgment "that Turn was not in contractual privity with Levtec," and has neither a contractual claim nor quantum meruit claim against Levtec. (*Id.*) Alternatively, if a valid contract exists between Levtec and Turn, Levtec alleges that Turn breached that contract by failing to perform the Turn services set forth in the September 25th Insertion Order. (*Id.* at ¶¶ 33-34.)

With its Answer to the Second Amended Complaint, Turn filed a Counterclaim consisting of three claims against Levtec: declaratory judgment, breach of contract and quantum meruit/unjust enrichment. (Doc. 32.) Turn alleges that the September 25th Insertion Order is a contract between Levtec and Turn. Turn seeks a declaratory judgment to that effect and, under its breach of contract claim, payment of the $60,842.84 remaining unpaid on the September 25th Insertion Order. In the alternative, if the September 25th Insertion Order is not a valid contract, then Turn seeks to recover the reasonable value of its services for Levtec under its quantum meruit/unjust enrichment claim.

The Barkan Defendants filed a Counterclaim with their Answer to the First Amended Complaint asserting claims for breach of contract, unjust enrichment, and declaratory judgment. (Doc. 12.) Under the breach of contract claim, the Barkan Defendants allege that Barkan and Levtec entered into an agreement for Barkan Advertising to provide advertising placement on behalf of Levtec. The Barkan Defendants seek to recover $5,000 from Levtec for the advertisement that Barkan Advertising placed with Time Warner Cable pursuant to that agreement. Alternatively, they seek reimbursement of the same amount from Levtec under their unjust enrichment claim. The Barkan Defendants' claim for declaratory judgment seeks a judgment pursuant to Ohio Revised Code Chapter 2721 that they are entitled to keep the amounts that they received from Levtec as "commissions" for Turn's ad placement services.

The Barkan Defendants move for summary judgment on both Levtec's claims against them

and their Counterclaim against Levtec for breach of contract, unjust enrichment, and declaratory judgment. (Doc. 44 at 1.) Turn moves for summary judgment on Levtec's claim for breach of contract against it and on its Counterclaim against Levtec for declaratory judgment, breach of contract, and unjust enrichment. (Doc. 45.)

## II.   SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992) (quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party cannot rest on its pleadings or merely reassert its previous allegations. Nor is it sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of

evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A *Wright & Miller, Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.* The mere existence of a scintilla of evidence in support of the nonmoving party, however, is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

III.   **ANALYSIS**

A. **The Barkan Defendants' Motion for Summary Judgment**

With the exception of the Barkan Defendants' claim for unjust enrichment, all of the claims between Levtec and the Barkan Defendants are premised on the existence of an oral contract between them. The success of the unjust enrichment claim also depends on the existence of the

alleged oral contract, as a party cannot recover on a theory of unjust enrichment where a contract covers the same subject matter. *HAD Ents. v. Galloway*, 2011-Ohio-57, ¶ 10. It stands to reason that the Court's determination of whether Levtec and the Barkan Defendants entered into an oral contract depends, in significant part, on its assessment of the parties' testimony—since, of course, the contract was never reduced to writing. As the assessment of the parties' testimony necessarily involves an assessment of their credibility—an issue of fact—summary judgment is inappropriate. *LaPoint v. Templeton*, 2008-Ohio-1792, ¶ 35 ("The fact of the existence of a contract and the terms of an oral contract are ordinarily for the determination of the jury in light of the evidence offered, to be determined from all the facts, words, acts, conduct, and circumstances surrounding the parties at the time.") (quoting 89 Ohio Jurisprudence 3d, Trial, Section 178).

"Fundamental to valid contract formation is that the parties must evince a meeting of the minds; that is, valid offer and acceptance such that a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005-Ohio-4931, ¶ 40 (citing 17 Ohio Jurisprudence 3d (2003), Contracts, Sections 15, 16, 18, 24). The terms of an oral contract may be determined from "words, deeds, acts, and silence of the parties." *Id.* (quoting *Kostelnik v. Helper*, 2002-Ohio-2985, at ¶ 15). Although a contract may have "some degree of indefiniteness and some degree of uncertainty," it may not be enforced unless there is a meeting of the minds as to its essential terms. *Id.* (quoting 17 Ohio Jurisprudence 3d, Contracts, Section 1). The essential terms of a contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and consideration." *Id.*

Here, the parties dispute the essential terms of the alleged oral contract—specifically what services Barkan Advertising was obligated to perform for Levtec. Levtec and the Barkan

Defendants initially appeared to agree, as a general matter, that Levtec and Barkan Advertising entered into an oral contract for Barkan Advertising to provide assistance in creating an advertising campaign for Levtec's Morph Fire products.  (Doc. 44 at 4 (citing Doc. 44-1 at 79; 80-81); Doc. 51-1 at ¶ 10.)  In the Barkan Defendants' reply memorandum, however, they assert that the parties failed to create a binding contract because they never reached an agreement on essential terms.  (Doc. 58 at 2-3.)

Levtec alleges that Barkan Advertising agreed to provide the services described in Barkan's March 8, 2013 PowerPoint presentation to Levtec.  Levtec summarizes the "key services" that Barkan Advertising could provide as follows:

> As to strategy, Barkan represented that Barkan's team could provide Levtec with services in advertising campaign development, strategic media buying and planning, strategic brand development  and social media strategy and solutions. [Doc. 51-1 at ¶ 6.]  As to design, Barkan represented that Barkan's team could provide Levtec with mobile application design, website and mobile web UI/UX design, packaging design and production, and social media channel branding.  *Id*. As to technology, Barkan represented that Barkan's team could provide Levtec with mobile app development and deployment, content management systems, contest implementation and third-party integration with CRM ("customer relationship management") and social media analytics.  *Id*.  As to production, Barkan represented that Barkan's team could provide Levtec with mobile rich media ad development, traditional and digital media production, packaging design and production and responsive design optimization.  *Id*.

(Doc. 51 at 2.)

The Barkan Defendants originally asserted that the contract between Levtec and Barkan Advertising included "traditional media advertising services (i.e., cable and print advertisements) which would be performed by Barkan and non-traditional media services, including 'website analytics,' (i.e., pixel and media placement/electronic data mining) which would be performed by TURN."  (Doc. 44 at 4 (citing Doc. 44-1 at 73-77) (emphasis in original).)  The Barkan Defendants further asserted that Levtec agreed to pay Barkan 15% of the total amount of money it

10

"invested" with Turn to provide media services.  (Doc. 44 at 4 (citing Doc. 44-1 at 94-95).)

The Barkan Defendants also refer to a written Agency Authorization signed by Levtec, which states that Barkan Advertising is an authorized agent to place media orders relating to Morph Fire products.  (Doc. 44-1 at PAGEID# 429.)  Both Levtec and the Barkan Defendants agree that they entered into this Agency Authorization so that Barkan Advertising could purchase advertising from Time Warner Cable.  (Doc. 44-2 at ¶ 8; Doc. 51 at 8.)  It is also undisputed that Barkan advertising purchased $5,000 of advertising from Time Warner Cable.  Both parties refer to this Agency Authorization as a document used to facilitate their prior oral contract, however, and not as a stand-alone contract.  (Doc. 44 at 9; Doc. 51 at 15.)  As a result, the Court's determination of the parties' obligations under the Agency Authorization may be affected by its findings regarding the alleged oral contract.

In sum, the merits of the claims between Levtec and the Barkan Defendants depend on the Court's determination of whether an oral contract existed between them and, if so, on what terms. Due to the genuine issues of material fact that must be resolved to make that determination, the Court denies the Barkan Defendants' Motion for Summary Judgment.

### B. <u>Turn's Motion for Summary Judgment</u>

The merits of the claims between Levtec and Turn also depend on the nature of their relationship.  Levtec contends that it was not in contractual privity with Turn, but that Turn was a subcontractor to Barkan Advertising.  (Doc. 51 at 6.)  According to Levtec, Barkan Advertising is therefore responsible for payment of any amounts owed to Turn.  (*Id.*)  Conversely, Turn contends that the September 25th and December 20th Insertion Orders are binding contracts between it and Levtec, pursuant to which Levtec owes Turn a total of $ $80,842.84.[1]  Thus,

---

1.  The Court notes that Turn's claim for breach of contract is based on only the September 25th Insertion Order (see

Levtec and Turn have drastically different understandings of their legal relationship with each other.

The Court cannot decide the question of whether Turn was Barkan Advertising's subcontractor without ruling on the question of whether Levtec entered into an oral contract for Barkan Advertising's services. Nor can the Court determine the validity of the December 20th Insertion Order—signed by Barkan on Levtec's behalf—without ruling on that alleged oral contract. As previously discussed, issues of fact preclude summary judgment on whether Levtec and Barkan Advertising entered into an oral contract and, if so, on what terms.

Factual issues also preclude summary judgment on any claim arising out of the September 25th Insertion Order. Levtec contends that it required the "prepay" term in the September 25th Insertion Order because it was "under financial restraints and could not commit to pay the full $90,000 indicated on the face of the insertion order." (Doc. 51 at 4 (citing Doc. 51-1 at ¶ 11).) Instead, Levtec asserts that "the agreement between Levtec and Barkan was that Levtec would authorize Barkan from time to time to place online advertising impressions, and to make prepayment to Barkan for same as the campaign progressed." (*Id.*) Turn contends that, although the prepay term required Levtec's prepayment of the amounts due, it was not a condition precedent to Turn's performance. Turn therefore argues that it was permitted to proceed with its performance under the Insertion Order—despite Levtec's failure to prepay—and then seek damages for breach of contract.

The meaning of the prepay term is central to Levtec's and Turn's respective rights and obligations under the September 25th Insertion Order. Yet, neither the September 25th Insertion Order nor the IAB Terms (Doc. 45-9), which are incorporated by reference, define the prepay

Doc. 32 at 8, 10-11), but its claim for quantum meruit/unjust enrichment is based on services performed under both the September 25th and December 20th Insertion Orders (see *id*. at 11).

term.   To the contrary, the IAB Terms contemplate invoicing for services "upon completion of the first month's delivery, or within 30 days of completion of the [Insertion Order], whichever is earlier."   (Doc. 45-9 at 3.)   The IAB Terms further provide that "[i]n the event of any inconsistency between the terms of an [Insertion Order] and these Terms, the terms of the [Insertion Order] will prevail."   (*Id.* at 12.)   The prepay term in the Insertion Order consists of just three words:   "Payment Terms – Prepay".   With such limited language in the Insertion Order, both Levtec's interpretation and Turn's interpretation of the prepay term are equally plausible.   As a result, "parol evidence is admissible to aid in interpreting the agreement, thereby presenting a question of fact which precludes summary judgment if the evidence is contradictory." *Wolf v. Superior Court*, 114 Cal. App. 4th 1343, 1351 (2004), as modified on denial of reh'g (Feb. 19, 2004) (internal quotation omitted).[2]

The Court denies Turn's Motion for Summary Judgment.

## IV.   CONCLUSION

For the foregoing reasons, the Barkan Defendants' Motion for Summary Judgment (Doc. 44) and Turn's Motion for Summary Judgment (Doc. 45) are **DENIED**.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, November 3, 2016.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

---

2.   The September 25th Insertion Order states that California law governs its terms.   (Doc. 45-8.)