## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| LEVTEC, LLC, | : | Case No. 3:14-cv-276 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| MICHELLE BARKAN, BARKAN | : | |
| ADVERTISING, LLC, TURN INC., | : | |
| | : | |
| Defendants. | : | |

_____

## FINDINGS OF FACT, CONCLUSIONS OF LAW
## AND JUDGMENT AS TO LIABILITY ONLY
_____

From May 15-17, 2017, the Court held a bench trial as to liability on the claims and counterclaims between Plaintiff Levtec, LLC ("Levtec") and Defendants Michelle Barkan ("Barkan"), Barkan Advertising, LLC ("Barkan Advertising") and Turn, LLC ("Turn"). On May 31, 2017, the parties each filed proposed findings of fact and conclusions of law for the Court's consideration.

Pursuant to Federal Rule of Civil Procedure 52(a) and having reviewed the pleadings and the parties' post-trial submissions, the Court now makes the following findings of fact and conclusions of law and enters judgment as to liability as follows.

## I.    FINDINGS OF FACT

1.    Levtec is an Ohio limited liability company based in Montgomery County, Ohio.

2.    Greg Dove is the President of Levtec and a closely affiliated company,

Levin Services, Inc. ("Levin Services").

3.      Levtec owns the rights to a line of products known as Morph Fire, which are comprised of kits that convert different brands of paintball guns to BB machine guns. Morph Fire was created in 2012 and was first available for sale in September of 2013.

4.      In early 2013, Levtec decided to develop an online advertising and marketing plan to roll out the Morph Fire products for sale to the public.

5.      Barkan and her prior business, Agencies Direct, had acted as a media buyer for Levin Services. Dove was familiar with Barkan's business from her prior engagement with Levin Services.

6.      Levtec approached Barkan and asked if she could recommend someone to assist Levtec with the advertising and marketing campaign to launch the Morph Fire products.

7.      In response, on March 8, 2013, Barkan made a PowerPoint presentation (Plaintiff's Exhibit ("PX")-47) to Levtec and began to discuss an advertising campaign, which would include media and electronic advertising for the launch of Morph Fire.

8.      The PowerPoint presentation refers to a group of businesses and individuals, including Barkan Advertising, and the general services each could provide on the marketing campaign.

9.      Page 2 of the PowerPoint states: "Who We Are/We are a collaboration group of marketing experts that specializes in end to end marketing solutions. Specifically: strategy, design, technology and production."

10.     Page 3 of the PowerPoint lists an overview of the "Key Services" that could be provided in the areas of strategy, design, technology and production.

11.     Page 4 of the PowerPoint presentation, which is titled "We are Complete", states that "Each of our clients works directly with one or more of our partners. Complete is how we describe the combined services between our partners, a group of business owners who are all leaders in their individual creative fields."

12.     The PowerPoint presentation did not include specific details as to the cost or scope of "services" to be performed by each business or individual and it did not indicate a time for performance of the services.

13.     After the March 8, 2013 PowerPoint presentation, Levtec decided to move forward with the Morph Fire marketing campaign and asked Barkan for a referral to a marketing company. Barkan provided three company names to Dove, who researched the companies.

14.     In a subsequent meeting, Barkan introduced Levtec representatives to one of her team members, Barbara Gorder, and Gorder's company, Undisclosed Locations, or "UNLO." Levtec entered a written contract with UNLO to produce the creative art in the Morph Fire marketing campaign. Neither Barkan nor her company was a party to that contract, nor did Levtec and Barkan agree that Barkan would be paid any compensation for UNLO's services.

15.     UNLO performed customer surveys and market research, and created the packaging for the Morph Fire products, the creative part of the campaign, including the photo shoots, art design, and the video for the website. As Greg Dove testified,

"[UNLO] created the look and feel for our merchandise, basically creating the brand."

(Doc. 103 at 17-18, 20, 28.)

16.     Levtec looked to UNLO to oversee the Morph Fire marketing campaign. After Levtec contracted with UNLO, UNLO presented an overall marketing campaign strategy and plan to Levtec, which included the services to be performed by Barkan.

17.     Unrelated to any introduction made by Barkan, Levtec contracted with Website Pipeline, Inc. ("Website Pipeline") to establish and host a website for the Morph Fire marketing campaign.  Levtec determined that Website Pipeline's software integrated with Levtec's existing accounting software, unlike the website candidate suggested by Barkan.  Website Pipeline created the website and performed website analytics.  It was also tasked with placing pixels on the website.

18.     Levtec and Barkan Advertising agreed that Barkan Advertising would assist Levtec in the purchase of traditional and digital media advertising or "media buys" for the Morph Fire marketing campaign.  In exchange for Barkan Advertising's services, Levtec agreed to pay Barkan 15% of the total amount Levtec invested in digital and traditional advertising placements, with her assistance, over the course of the campaign.

19.     Barkan did not agree to provide all the services listed in the 2013 PowerPoint presentation.  Barkan did not promise a successful campaign or that Levtec's purchase of digital or traditional media advertisements would produce a certain number of sales.

20.     Barkan proposed a budget to perform these services of $141,000, but

Levtec rejected this proposal. Levtec was running short on cash and expressed to Barkan the need to control costs by prepaying for Barkan's services.

21. Barkan introduced Levtec to Turn, a digital marketing company, that, among other services, facilitates bidding and ad serving for customers across digital media including websites and social media platforms.

22. Turn facilitates the delivery of "impressions" for its advertiser customers. An instance of a displayed ad to a single user is known as an "impression."

23. Barkan received an Insertion Order dated September 25, 2013 (hereinafter, the "September 25, 2013 IO") from Turn and forwarded it to Levtec by email. Dove signed the September 25, 2013 IO on behalf of Levtec, and Turn's Director of Revenue Operations countersigned it on September 27, 2013.

24. Barkan did not provide Dove with the IAB Standard Terms and Conditions (Defendant Turn's Exhibit ("DTX")-4), incorporated by reference in the Insertion Order.

25. The IAB Terms address, among other issues: (a) the specific terms to be included in insertion orders, (b) inventory availability, (c) ad placement and positioning, (d) payment and payment liability, (e) Turn's reporting obligations, (f) cancellation and termination of insertion orders, (g) relationships between Turn, (h) the client and the client's authorized agent, (i) indemnification, and (j) limitation of liability.

26. Turn drafted pixel placement instructions for digital advertisements to be implemented on the Morph Fire website by Website Pipeline.

27. Barkan forwarded Turn's pixel placement instructions to Website

Pipeline, Levtec and UNLO during the relevant time period. Sometimes, Turn also communicated pixel placement instructions and information directly to Website Pipeline, Levtec, and UNLO.

28. In or around early October 2013, Barkan recognized that there were issues with the operation of the pixels on the Morph Fire website. In particular, the pixels did not appear to be correctly registering purchases and other information about potential customers' visits to the website. (PX-53.)

29. Due to these technical issues in the operation of the Morph Fire website, the marketing campaign was paused on November 5, 2013. The marketing campaign was restarted on November 22, 2013, after Barkan reported that the problems had been resolved. It is unclear, however, whether or not the issues with the Morph Fire website were ever actually corrected.

30. On November 22, 2013, Levtec signed a written "Agency Authorization" for Barkan to purchase traditional cable advertising space on Levtec's behalf with Time Warner Cable. (PX 45.) Pursuant to the oral agreement between Levtec and Barkan Advertising, Barkan would be paid 15% commission of the total amount Levtec invested in traditional cable advertising space under the Agency Authorization.

31. At the end of November 2013, Barkan purchased cable advertising space with Time Warner Cable of Louisville. (PX 73.)

32. Levtec never paid Barkan for the advertisements that she purchased on Levtec's behalf from Time Warner Cable of Louisville. Levtec also never directly paid Time Warner Cable of Louisville's invoice.

33.     Barkan signed a second Insertion Order dated December 20, 2013 (hereinafter, the "December 20, 2013 IO") to continue the Morph Fire campaign with Turn. (PX-2.)

34.     Levtec did not authorize Barkan to sign the December 20, 2013 IO on its behalf.  Dove was not aware of its existence until it was produced in discovery—not by Barkan—but by Turn.  (Doc. 103 at 38.)

35.     According to Turn's reporting and invoicing system, through October 15, 2013, Turn had delivered a total of 46,642,691 impressions for the Morph Fire campaign. (DTX 5 at 1.)   This included totals of 45,273,874 impressions for Turn Predictive Targeting, 105,070 for Turn Retargeting, and 506,488 for Turn Predictive Targeting PreRoll Video.  (*Id*. at 1-2.)   According to Turn's reporting and invoicing system, through December 18, 2013, Turn had delivered a total of 247,315,409 impressions for the Morph Fire campaign.  (*Id*. at 10; DTX 9-10.)

36.     According to Turn's reporting and  invoicing system, between December 18, 2013 and January 2, 2014, Turn had delivered a total of  10,964,472 impressions for the Morph Fire campaign.  (DTX 5 at 10-11.)    According to Turn's reporting and invoicing system, through January 2, 2014, Turn had delivered a  total of 258,279,881 impressions for the Morph Fire campaign. (*Id*.;  DTX 10.)

37.     Levtec produced no evidence of an alternate number of impressions that were delivered by Turn.

38.     Levtec never submitted a complaint regarding an inaccurate or incomplete report to Turn.

39.     Levtec paid two invoices from Turn for $549.29 and $28,607.87, for a total of $29,157.16, for Turn's services pursuant to the September 25, 2013 IO.  (PX-9; PX-10.) Levtec made no further payment to Turn, either directly or through any agents.  Levtec paid nothing to Turn, either directly or through any agent, in relation to the December 20, 2013 IO.

## II.     CONCLUSIONS OF LAW

### Overview of Levtec's Claims

40.     Levtec asserts four causes of action in the Second Amended Complaint: (1) fraud in the inducement against the Barkan Defendants, (2) breach of contract against the Barkan Defendants, (3) declaratory judgment against Turn, and (4) breach of contract against Turn. (Doc. 31 at ¶¶ 20-36.)

41.     Levtec had the burden of proving its claims by a preponderance of the evidence.

### Levtec's Claim for Fraud in the Inducement Against the Barkan Defendants

42.     Levtec alleges that Barkan made false and misleading representations to Levtec to induce it into entering an oral contract with Barkan Advertising.  (Doc. 31 at ¶¶ 21-26.)

43.     To prevail on its fraud claim, Levtec must prove the following elements: "(1) a representation (or concealment of a fact when there is a duty to disclose), (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, and (4) with intent to mislead another into relying upon it, (5) justifiable

reliance, and (6) resulting injury proximately caused by the reliance." *Volbers-Klarich v. Middletown Mgt., Inc.*, 125 Ohio St.3d 494, 2010-Ohio-2057, 929 N.E.2d 434, ¶27, citing *Burr v. Stark Cty. Bd. of Commrs.*, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101 (1986).

44.     When determining if reliance was justified, the factfinder may "consider the various circumstances involved, such as the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Bender v. Logan*, 2016-Ohio-5317, ¶ 55, 76 N.E.3d 336, 353 (quoting *Mar Jul, L.L.C. v. Hurst*, 4th Dist. Washington No. 12CA6, 2013-Ohio-479, 2013 WL 557108, ¶ 62 (internal quotations omitted)).

45.     The rule that reliance be justified is based upon policy and purpose:

> The rule of law is one of policy and its purpose is, while suppressing fraud on the one hand, not to encourage negligence and inattention to one's own interests. There would seem to be no doubt that while in ordinary business transactions, individuals are expected to exercise reasonable prudence and not to rely upon others with whom they deal to care for and protect their interests, this requirement is not to be carried so far that the law shall ignore or protect positive, intentional fraud successfully practiced upon the simple- minded or unwary." *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495-496, 613 N.E.2d 1060 (2nd Dist. 1999), quoting 50 Ohio Jurisprudence 3d (1984), Fraud and Deceit, Section 132.

*Bender v. Logan*, 2016-Ohio-5317, ¶ 54, 76 N.E.3d 336, 353 (quoting *Amerifirst Savings Bank of Xenia v. Krug*, 136 Ohio App.3d 468, 495–496, 737 N.E.2d 68 (2nd Dist.1999) (internal quotations omitted)).

46.     Levtec failed to prove that Barkan fraudulently induced it into entering a

contract with Barkan Advertising. First, Levtec did not prove that Barkan made a false representation of material fact, either intentionally or recklessly, with the intent to mislead Levtec into entering a contract with Barkan Advertising. Second, even if Levtec were to have proven such facts, Levtec did not prove that its reliance on any such false representation would have been justifiable.

### Levtec's Claim for Breach of Contract Against Barkan

47.    Levtec alleges that Barkan Advertising "materially breached its oral contract with Levtec by failing to deliver a successful online customer website interface as Barkan had promised." (Doc. 31 at ¶¶ 24-26.)

48.    "Fundamental to valid contract formation is that the parties must evince a meeting of the minds; that is, valid offer and acceptance such that a reasonable person would find that the parties manifested a present intention to be bound to an agreement." *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005-Ohio-4931, ¶ 40 (citing 17 Ohio Jurisprudence 3d (2003), Contracts, Sections 15, 16, 18, 24). The "[t]erms of an oral contract may be determined from words, deeds, acts, and silence of the parties." *Id.* (quoting *Kostelnik v. Helper*, 96 Ohio St.3d 1, 770 N.E.2d 58, 2002–Ohio–2985, at ¶ 15 (internal quotations omitted)).

49.    The essential elements of a contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and consideration." *Id.* Finally, the parties must have a common and distinct intention, and that intention must be communicated by each party to the other. *Bradley v. Farmers New World Life Ins. Co.*, 112

Ohio App. 3d 696, 679 N.E.2d 1178 (1st Dist. Hamilton County 1996), cause dismissed, 77 Ohio St. 3d 1409, 670 N.E.2d 999 (1996).

50.     "[T]o declare the existence of a contract, the parties to the contract must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain." *Telxon*, 2005-Ohio-4931, ¶ 41 (quoting *Purdin v. Hitchcock,* (Jan. 21, 1993), 4th Dist. No. CA 531, at *8).

51.     To establish a breach of contract, the plaintiff must establish "by a preponderance of the evidence that (1) a contract existed, (2) one party fulfilled his obligations, (3) the other party failed to fulfill his obligations, and (4) damages resulted from that failure." *Blake Homes, Ltd. v. FirstEnergy Corp.*, 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041, ¶ 77 (6th Dist.).

52.     The Court finds that Levtec entered into an oral agreement with Barkan Advertising to assist in the purchase of traditional and digital media advertising or "media buys" for the Morph Fire marketing campaign.   In exchange for Barkan Advertising's services, Levtec agreed to pay Barkan 15% of the total amount Levtec invested in digital and traditional advertising placements, with her assistance, over the course of the campaign

53.     The 2013 PowerPoint presentation was a "pitch" document made in preliminary negotiations—it was not an offer by Barkan to perform all services listed or included in the presentation.

54.     Levtec did not prove that Barkan Advertising and Levtec agreed that Barkan Advertising was "to deliver a successful online customer website interface."

Specifically, the evidence does not support a finding that Barkan Advertising agreed to take responsibility for development of Levtec's "online customer website interface" for the Morph Fire marketing campaign. Nor does the evidence support a finding that Barkan Advertising promised that Levtec's marketing campaign for the Morph Fire product would achieve certain results, much less that it would be "successful."

55. Levtec failed to carry its burden of proving that Barkan Advertising breached its oral contract with Levtec.

### Levtec's Claim for Declaratory Judgment re: Barkan/Turn Relationship

56. Levtec seeks a declaratory judgment under Ohio Revised Code Chapter 2721 "that Turn was at all times relevant to this Second Amended Complaint in contractual privity with, and was the subcontractor of, Barkan, and as such must look to Barkan for any payment to which Turn is entitled for its services on the project." (Doc. 31 at ¶ 29.)

57. Levtec failed to carry its burden of proving the existence of a contractual relationship between any of the Barkan Defendants and Turn – whether a general-subcontractor relationship or other contractual relationship. Testimony reflected that Barkan and Turn in fact had no contractual relationship.

### Levtec's Claim for Breach of Contract Against Turn

58. For its breach-of-contract claim, Levtec alleges that the September 25, 2013 IO is a contract between Levtec and Turn, and that Turn breached that contract by failing to provide the services set forth therein. (Doc. 31 at ¶¶ 33-34 and Ex. A; PX- 39.)

59. Under California law, "the essential elements of a contract are parties

capable of contracting, their consent, a lawful object, and sufficient consideration." *Viramontes v. Desert Auto Plaza*, 2015 WL 5004545, at *3 (Cal. Ct. App. Aug. 24, 2015); Cal. Civil Code § 1550. Contract formation and interpretation are questions of law for the court to determine. *Wall Data Inc. v. Los Angeles Cty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir. 2006).

60. Under California law, "ordinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms." *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049, 107 Cal. Rptr. 2d 645, 651 (2001), as modified (June 8, 2001). Further, "[a] party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing." *Id.*

61. The Court finds that the September 25, 2013 IO is a contract between Turn and Levtec.

62. The written contents of the September 25, 2013 IO include in relevant part:

   a. The "Advertiser" is identified as "Levin Service Company Inc. dba LEVTEC, LLC," with the address of "7812 McEwen Rd., Suite 200."

   b. Above the signature space is printed in capital letters "THIS IO IS A CONFIRMATION OF THE CONTRACTED RENTAL OF ADVERTISING SPACE BETWEEN ADVERTISER AND TURN."

   c. Under its terms, the September 25, 2013 IO obligates Turn to provide three ad facilitation services for Levtec (described under the "Tactic Name" column of the "Campaign Description"), and specifies the cost for each service: $45,000 for "Turn Predictive Targeting & Site Retargeting"; $15,000 for "FBX Predictive & Site Retargeting," and $30,000 for "Turn Predictive Targeting & Retargeting PreRoll Video." Under the Sept. 25 IO Turn is to deliver 15,000,000 impressions, 5,000,000 impressions and 3,333,333 impressions for each category respectively—a total of

23,333,333 impressions.

d. The September 25, 2013 IO reflects a "Total Cost" of "$90,000" for the campaign, with a "Prepay" payment term.

e. In the September 25, 2013, IO, the "Start" date for the campaign is identified as September 26, 2013, and the "End" date is identified as December 20, 2013.

f. The September 25, 2013 IO specifies that the "System of Record" is to be provided by "Turn's reporting system."

g. The September 25, 2013 IO incorporates by reference the "IAB Standard Terms and Conditions for Interactive Advertising for Media Buys of One Year or Less v. 3."

h. The September 25, 2013 IO provides that "California law governs this IO . . . ."

i. The September 25, 2013 IO provides that "This IO is non-cancellable."

63. The IAB Standard Terms and Conditions incorporated by reference into the September 25, 2013 IO include in relevant part:

a. In the section titled "Payment Liability," Turn "agrees to hold Agency liable for payments solely to the extent proceeds have cleared from Advertiser to Agency for Ads placed in accordance with the IO. For sums not cleared to Agency, Media Company agrees to hold Advertiser solely liable. Media Company understands that Advertiser is Agency's disclosed principal and Agency, as agent, has no obligations relating to such payments . . . ."

b. The IAB Standard Terms and Conditions prescribe a process that must be used in the event that Turn delivers an incomplete or inaccurate report of the campaign.

c. Under the provision titled "Entire Agreement," "[e]ach IO (including the [IAB Terms]) will constitute the entire agreement of the parties ... and supersede all previous communications, representations, understandings, and agreements, either oral or written, between the parties with respect to the subject matter of the IO."

64. The terms of the IO do not provide for the maintenance or analysis of the advertiser's (i.e., Levtec's) own website. Thus, Turn had no obligation to ensure the functionality or performance of Levtec's Morph Fire website.

65. Turn complied with its obligations under the Sept. 25 IO. According to Turn's reporting and invoicing system, through October 15, 2013, Turn had delivered a total of 46,642,691 impressions for the Levtec MorphFire campaign. (DTX 5 at 1.) This included totals of 45,273,874 impressions for Turn Predictive Targeting, 105,070 for Turn Retargeting, and 506,488 for Turn Predictive Targeting PreRoll Video. (*Id.* at 1-2.) According to Turn's reporting and invoicing system, through December 18, 2013, Turn had delivered a total of 247,315,409 impressions for the Levtec MorphFire campaign. (*Id.* at 10; DTX 9-10.)

66. The September 25 IO provides that Turn's own reporting system is to be the "System of Record," and thus is definitive in determining the number of impressions delivered.

67. Levtec did not produce evidence establishing that Turn delivered a different number of impressions than stated in Turn's System of Record. Levtec's President of Levtec, Gregory Dove, also testified that Levtec had no evidence that Turn delivered less than the requisite number of impressions.

68. Because it delivered more than the minimum number of required impressions, Turn fully performed its obligations under the September 25, 2013 IO.

69. Although the IAB Standard Terms and Conditions state what advertisers must do in the event that an inaccurate or incomplete report is delivered by Turn, Levtec

never submitted a complaint regarding a report to Turn.

70.     Levtec failed to prove that Turn breached the September 25, 2013 IO.

### Overview of the Barkan Defendants' Counterclaims

71.     The Barkan Defendants assert counterclaims for breach of contract, unjust enrichment, and declaratory judgment.  (Doc. 12.)

72.     The Barkan Defendants have the burden of proving their counterclaims by a preponderance of the evidence.

### The Barkan Defendants' Counterclaim for Breach of Contract

73.     Under their breach-of-contract claim, the Barkan Defendants allege that Barkan Advertising and Levtec entered into an agreement pursuant to which Barkan Advertising would provide advertising placement on Levtec's behalf.   (Doc. 12, Counterclaim at ¶ 19.)   They specifically allege that Barkan Advertising placed advertisements with Time Warner Cable of Louisville, but Levtec failed to make payments on the money owed to Barkan Advertising for its placement of those advertisements.  (*Id.* at ¶¶ 20-21.)

74.     The Court finds that Barkan Advertising and Levtec entered into an agreement for Barkan Advertising to purchase cable advertising space for the Morph Fire marketing campaign, on Levtec's behalf, as evidenced by the written Agency Authorization.

75.     Pursuant to the Agency Authorization, Levtec specifically understood and authorized Barkan Advertising to purchase traditional cable advertising space from Time Warner Cable of Louisville.

76. On Levtec's behalf, Barkan Advertising purchased advertising space for the Morph Fire marketing campaign from Time Warner Cable of Louisville.

77. Levtec did not pay the amounts that it owed to Barkan Advertising for its purchase of the advertising space from Time Warner Cable of Louisville.

78. Levtec therefore breached its agreement with Barkan Advertising and the Barkan Defendants are entitled to judgment on their breach-of-contract claim.

**The Barkan Defendants' Counterclaim for Unjust Enrichment**

79. The Barkan Defendants assert a claim for unjust enrichment based on the premise that Levtec was unjustly enriched because it received the benefit of the advertisements shown on Time Warner Cable in Louisville, without paying for the advertising space purchased by Barkan Advertising. (Doc. 12, Counterclaim at ¶¶ 22-24)

80. Having found that Levtec is liable to the Barkan Defendants on their breach-of-contract claim, they cannot recover for the same conduct under their claim for unjust enrichment. *See Ryan v. Rival Mfg. Co.*, 1st Dist. Hamilton No. C–810032, 1981 WL 10160 (Dec. 16, 1981).

81. The Court therefore finds that Levtec is not liable to the Barkan Defendants under their claim for unjust enrichment.

**The Barkan Defendants' Counterclaim for Declaratory Judgment**

82. The Barkan Defendants' claim for declaratory judgment seeks a judgment pursuant to Ohio Revised Code Chapter 2721 that they are entitled to keep the amounts that they received from Levtec as "commissions" for Turn's ad placement services. (Doc. 12, Counterclaim at ¶¶ 20-23.)

83. The Court has already found that Levtec and Barkan Advertising entered into an oral contract by which Barkan Advertising would perform traditional and digital "media buys" for the Morph Fire marketing campaign in exchange for a 15% commission on the total amounts that Levtec invested in that campaign with Barkan Advertising's assistance.

84. The Court bifurcated the trial of this matter between liability and damages. (Doc. 99.) These Findings of Fact and Conclusions of Law relate only to liability on the parties' claims and counterclaims. Since the Barkan Defendants are seeking a judgment regarding the amounts owed, if any, under the oral contract—a determination related to damages, their claim for declaratory judgment must be addressed after the trial on damages.

### Overview of Turn's Counterclaims

85. In its Counterclaim, Turn asserts three claims against Levtec for declaratory judgment, breach of contract and quantum meruit/unjust enrichment. (Doc. 32 at ¶¶ 24-36.)

86. Turn has the burden of proving its counterclaims by a preponderance of the evidence.

### Turn's Counterclaim for Declaratory Judgment regarding the Contractual Relationships among Levtec, Turn and Barkan

87. Turn seeks a declaratory judgment that the September 25, 2013 IO is a contract between Levtec and Turn. (Doc. 32 at ¶¶ 24-26)

88. In deciding Levtec's breach-of-contract claim against Turn, the Court

found that the September 25, 2013 IO is a contract between Levtec and Turn.  In addition, the Court has found that no general-subcontractor relationship or any other contractual relationship existed between Barkan Advertising and Turn.  Turn is therefore entitled to declaratory judgment on this claim.

### Turn's Counterclaim for Breach of Contract against Levtec

89.     Under its breach-of-contract claim, Turn alleges that the September 25, 2013 IO is a contract between Turn and Levtec.  Turn alleges that it performed its obligations under the September 25, 2013 IO, but Levtec breached the contract by failing to pay the total amount due to Turn.  (Doc. 32 at ¶¶ 27-32)

90.     As the Court has already found, the September 25, 2013 IO is a contract between Levtec and Turn.

91.     The Court also found that Turn fully performed its obligations under the September 25, 2013 IO.

92.     The Court finds that the "Prepay" payment term in the September 25, 2013 IO was a condition precedent to Turn's performance of its obligations, which Turn could enforce or waive.  It was not a condition precedent to Levtec's obligation to pay for Turn's services.

93.     Turn chose to begin delivery of impressions before receiving payment, and thus waived the "Prepay" condition.

94.     Through Barkan, Levtec paid two invoices from Turn for $549.29 and $28,607.87, for a total of $29,157.16.  (PX-9; PX-10.)

95.     Levtec made no further payment to Turn, either directly or through any agents.

96.     While Turn waived the prepay condition, Levtec was nevertheless obligated to pay the total cost of $90,000 in exchange for Turn's services in delivering the impressions for the Morph Fire marketing campaign.

97.     Levtec is therefore liable to Turn on Turn's breach-of-contract claim.

**Turn, Inc.'s Counterclaim for Unjust Enrichment against Levtec**

98.     Turn also asserts a claim for unjust enrichment against Levtec to recover the money allegedly owed on both the September 25, 2013 IO and the December 20, 2013 IO.

99.     Since Turn has prevailed on its claim for breach of the September 25, 2013 IO, it cannot hold Levtec liable for the same conduct under a theory of unjust enrichment.  *See Ryan v. Rival Mfg. Co.*, 1st Dist. Hamilton No. C–810032, 1981 WL 10160 (Dec. 16, 1981).

100.     If the December 20, 2013 IO is not a contract between Turn and Levtec, Turn may pursue its unjust enrichment claim to recover for the benefits that it conferred on Levtec pursuant to that Insertion Order.  *See Myers v. Good, Ross,* 2007 WL 2897753 at ¶ 12 (Ohio Ct. App. 2007).

101.     To state a claim for unjust enrichment, a plaintiff must establish "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  *Camp St. Mary's Assn. of W. Ohio v. Otterbein Homes*, 176 Ohio App. 3d 54, 70 (2008).

102.     The December 20, 2013 IO is not a contract between Turn and Levtec.

103.     Barkan signed the December 20, 2013 IO, but Levtec did not authorize her to do so on its behalf.  Barkan Advertising and Levtec orally agreed that Barkan would assist in placing traditional and digital media buys, but the evidence did not establish that they agreed that Barkan Advertising was authorized to sign on Levtec's behalf when making media buys from all vendors.  Barkan, for example, did not sign the September 25, 2013 IO, but submitted it to Levtec for signature.  In contrast, Levtec expressly authorized Barkan to place advertisements with Time Warner Cable on its behalf through a separate, written Agency Authorization.

104.     Turn also did not prove that Levtec held Barkan out as possessing authority to act as its agent.  After introducing Levtec to Turn, Barkan acted as an intermediary between the two parties, but, as indicated above, her authority to sign on Levtec's behalf was not clear based on the conduct of the parties.

105.     Under the December 20, 2013 IO, Turn was to provide three ad facilitation services for Levtec, and specifies the cost for each service:  $10,000 for "Turn Predictive Targeting & Site Retargeting"; $5,000 for "Turn Contextual Retargeting," and $5,000 for "Turn Predictive Targeting & Retargeting PreRoll Video" – a total of $20,000.  For each category, Turn is to deliver 3,333,333 impressions, 1,250,000 impressions and 555,555 impressions, respectively—a total of 5,138,88 impressions.

106.     Turn conferred a benefit on Levtec by providing the services set out in the December 20, 2013 IO.  According to Turn's reporting and invoicing system, between December 18, 2013 and January 2, 2014, Turn had delivered a total of 10,964,472 impressions for the Morph Fire marketing campaign.  (DTX 5 at 10-11.)  According to

Turn's reporting and invoicing system, through January 2, 2014, Turn had delivered a total of 258,279,881 impressions for the Morph Fire marketing campaign.  (*Id.*; DTX 10.)

107.    Turn also failed to prove that Levtec knew of Turn's delivery of impressions under the December 20, 2013 IO.  Levtec's President, Greg Dove, was not aware of its existence until it was produced in discovery by Turn.

108.    Turn also failed to prove that it would be unjust to permit Levtec to retain the benefit of the impressions delivered under the December 20, 2013 IO.  Before Barkan's execution of the December 20, 2013 IO, there was substantial communication among the parties regarding technical issues affecting the Morph Fire campaign.  The Morph Fire campaign was temporarily suspended while Barkan, Turn and Website Pipeline addressed the technical issues.  It is unclear, however, if the technical issues affecting the campaign were ever truly fixed.  Despite this uncertainty, Barkan and Turn continued the Morph Fire campaign under the December 20, 2013 IO.

109.    In light of the above circumstances, it is unclear that Levtec received any actual benefit from the impressions delivered by Turn.  Moreover, Turn either knew or was reckless to the possibility that the issues with the Morph Fire website were not adequately addressed.  Turn therefore failed to prove that permitting Levtec to retain the benefit, if any, of the impressions that Turn delivered under the December 20, 2013 IO would be unjust.

110.    Levtec is not liable to Turn under its claim for unjust enrichment.

### III.   CONCLUSION

In summary, the Court enters judgment as to liability as follows:

- Against Levtec on its claim for fraud in the inducement against the Barkan Defendants;

- Against Levtec on its claim for breach of contract against the Barkan Defendants;

- Against Levtec on its claim for declaratory judgment against Turn;

- Against Levtec on its claim for breach of contract against Turn;

- For the Barkan Defendants on their counterclaim for breach of contract against Levtec;

- Against the Barkan Defendants on their counterclaim for unjust enrichment against Levtec;

- For Turn on its counterclaim for declaratory judgment against Levtec;

- For Turn on its counterclaim for breach of contract against Levtec; and

- Against Turn on its counterclaim for unjust enrichment against Levtec.

The Court defers ruling on the Barkan Defendants' counterclaim for declaratory judgment until after the completion of the trial on damages.

This matter is set for a telephone conference on September 7, 2017 at 10:00 AM to discuss scheduling the trial on damages.

**DONE** and **ORDERED** in Dayton, Ohio, this Friday, August 25, 2017.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE